We are now recording. Hear ye, hear you, this Honorable Appellate Court for the Second Judicial District is now open. The Honorable Susan F. Hutchinson presiding. Your Honors, the only case on the docket this morning is 2-21-0615, in re the marriage of Heidi Bess, Petitioner-Appellee and Cross-Appellant, and Arthur G. Bess III, Respondent-Appellant and Cross-Appellee. Arguing for the Appellant-Cross-Appellee, Ms. Margaret E. Keene. Arguing for the Appellee-Cross-Appellant, Mr. Benton H. Page. All right, good morning, Counsel. And we've gone through the preliminaries off the record, but now we're ready to proceed. And Ms. Keene, you may do so. Thank you, Your Honor. May it please the Court, I am Margaret Keene, and I am representing Appellant-Appellee Art Bess in this matter. Art Bess filed this appeal because of the trial court's improper treatment of a stock portfolio, the vast majority of which consisted of J.P. Morgan stock that Art held in his full name at all times, and that were derived from non-marital sources, namely an inheritance from his mother, premarital purchases, or purchases through the use of non-marital collateral. All right, Ms. Keene, let me ask just one question to straighten something out for myself. It appears that that Raymond James account has more than just the shares that are at issue here. Was there any argument about those particular shares throughout the course of this rather lengthy proceeding? About the other shares, the other 30 percent? Bristol-Myers, Disney, General Electric, Gilead, Intel, Moderna, Pfizer, and either Spirit or Sprint. I can't read my own handwriting. There was argument that those particular securities were also non-marital as they derived from non-marital sources, but the tracing focused on the J.P. Morgan and the other Wintrust shares. Did these stocks remain in this Raymond James account throughout these proceedings? The J.P. Morgan stock remained, and I can trace it from it being deposited into the account until judgment, essentially, until the last statement of trial. Okay, and what about the, we'll call them the odd shares now since they haven't been highlighted? The Bank of America, Bristol-Myers, are they still or were they still in the account at the time of the hearings? That I cannot answer because we were focusing on not the container as either being marital or non-marital, but the securities within the container. Okay. The securities that we were tracing were the ones that derived directly from the charter bank stock and, you know, through mergers, acquisitions, stock splits, et cetera, was deposited into the Baird account, which was the predecessor account for the Raymond James 7178 account. There was at least one other Raymond James account before the 7178, correct? It was a Baird account. So the Baird account, this is how it went, where all the J.P. Morgan stocks were held. There were 58,000 shares of J.P. Morgan held in a Raymond James account ending in 7178, and that's the main account I've issued here. The J.P. Morgan stock in that account represented 70% of all the assets contained within 7178. Then there were 12,000 shares of J.P. Morgan stock derived from the same source that were held in a Raymond James account ending in U990, and this was titled in our sole name. It represented 100% of the assets in the account. So there was nothing but the J.P. Morgan stock in U990. And then there's the stipulated 6,600 shares that were held directly by art and certificate form, and those were also titled in his own name. So how many stacks of J.P. Morgan are at issue then here? All of those? All of those. So the 76,600 shares are at issue. All right. And despite the fact that these all came from a non-marital source, the trial court classified all of them as marital and awarded 75% of the aggregate value of the Raymond James 7178 account, which held the 58,000 shares of J.P. Morgan to Heidi, as well as 6,600 certificate shares of J.P. Morgan. In contrast, Art was awarded his marital property, 25% of the aggregate value of the Raymond James 7178 account, which held the 58,000 shares, as well as 12,000 shares of U990. And this outcome was based on several substantial errors of law. The first I touched on, which was treating the Raymond James account as the 7178, as a single asset, when Illinois provides that accounts are mere receptacles for the assets they retain. So it is the assets and not the receptacle that are to be classified as marital or non-marital. Second, the court failed to apply relevant law to the facts regarding purchases of assets on margin. So the court omitted any section 503A.6.5 of the Illinois Marriage and Disposition of Marriage Act, which governs the use of what the margin purchases were. And finally, the court erred in ruling that the deposit of assets into the 7178 account, again, which was titled in Art's own name alone, was sufficient to transfer the assets deposited. There was no presumption of a gap for a solely titled account. Now, this outcome, the court's judgment, was also against the manifesto of the evidence. And even though the court noticed that the ruling had to be driven by the documentary evidence, the court actually failed to engage with such evidence. Your argument in your brief often talks about a domino effect coming from the very beginning. And I think that very beginning is a $74,850 deposit that doesn't really become an issue until we get to trial. According to your client and your brief, you said your client didn't know that there was no interrogatory that addressed this asset. I think I found some interrogatories that have, but be that as it may, why does this not show up? Or why don't we have some other proof of this non-marital status of this money that was wired in? Where did it go? What was it? Well, this $74,000 was received contemporaneously with the death of Art's father. And he died many years prior to the actual... I think this was 1998, I think, this money. Right, so it was in 1997, in December 1997, he died. That was deposited into the Baird account. The interrogatory, that was long before the filing of this case. That money had been placed in 717A for so long ago that it's not something that would be considered non-marital property to be listed on an interrogatory. Could you not trace the origin of that wire transfer? I mean, isn't the burden on you to be able to say where that came from? Regardless of how long ago, I mean, banks keep records. Wouldn't you be able to prove where it came from? Well, that happened decades before the filing. Banks normally don't keep records that far back. And there was testimony by my client explaining that this is where it came from. I appreciate that, but that's what I'm saying. Other than any testimonial evidence, is there any other evidence as to what the source of this wire transfer was? Well, you can look to what other assets were in existence at that time. So there were personal financial statements that are filled out on an annual basis. And on there, you could see the total of assets of where things could come from. There were very few assets that could have been used to deposit $74,000. And it would have encompassed almost 50% of the income that year if it were just some income earned from his work at Best Hardware. Well, at Best Hardware, he never took what would be considered the CEO salary. He took a basic salary, as I believe the record shows. And the tax returns likewise show that. And all this time, he's trading. He's maybe not every single year, but significantly, he is trading during this period of time. So how can we tell what he was trading or how can we take that figure against what might have been there and what came later? I mean, it's clear and convincing evidence is what you needed to show. And how did you show that? So at Best Hardware, it was never a moneymaker. He never received large amounts. And it wasn't because he was underpaying himself. He was paying himself appropriately given the income that it generated, that Best Hardware generated. You know, one thing I will say is it really doesn't matter in the entire analysis whether or not that $74,850 was marital or non-marital. Because the effect that it had on the J.P. Morgan stock is minimal. The only effect that that money would have is to the extent that securities that were purchased using that $74,850 were used to secure the margin, which then purchased new stock, which ultimately became J.P. Morgan. So the question was, how did you prove that by clear and convincing evidence? I appreciate where you're going into one different argument, but where is your proof? Clear and convincing is to the origin of that $74,000. So I would argue. Miss Keene, I'm sorry, if you could start over, we've lost you for a second. The earnings were relatively modest. So ARC's earnings were relatively modest, as I mentioned. The personal financial statements every year showed there were no marital assets from which money could have been withdrawn. The 1998 tax returns show that he would have had to direct 50% of the family's total net income to that investment. And, again, there are funds that he received more than 20 years prior. There's no evidence contradicting his testimony. In fact, the circumstances support his testimony. So there's no reason to disregard evidence or testimony which follows the circumstances when there's nothing else showing an opposite conclusion could be reached. When you say 50% of the total net income, are you talking about employment income, or are you talking about? The income shown on the tax returns. Okay. And does this $78,000 ever show up anywhere on any of those documents that we're talking about here? No. Now, it wouldn't because it was he testified that it belonged to Best Hardware. It was a Best Hardware policy for which he was a beneficiary. It was paid for by Best Hardware. So it would not show up on any of his personal financial statements because it was an asset of the company. But Best Hardware had records that could have been presented, didn't they? Or where were those records? This business has been going since the mid-60s, I think, or early 60s. Pardon me. Unfortunately, there were new records. It's the 20 years. We were very lucky that he had the records he did, all of the personal financial statements dating back so long. It's practically unheard of for somebody to have the type, the level of documentation over such a long period of time. And businesses normally don't keep such records for so long. Record keeping is usually for a seven-year period. But he seemed to be a pretty good record keeper of, at least he says he is, of his personal and his stock business because things were produced. And he was, for a very long time, the sole owner of Best Hardware. So why wasn't he keeping records there? I believe he kept many records for Best Hardware, and many were part of the record in this case, part of the evidence in this case. Unfortunately, the check relating to that particular policy and the proceeds, he did not have. Ms. Keene, I appreciate your knowledge of this case, and I'm sure Mr. Page has a similar knowledge. The judge, Judge Christensen, seemed to have a good handle on what went where. But why wasn't there maybe a forensic accountant who came in and actually talked about this to the court? I was not the trial counsel for this case. Correct. I cannot speak to the decisions that were made in dealing with the trial counsel. I do think that the belief was that the records were somewhat easy to follow. They were all in evidence. And the reason I say they're somewhat easy to follow is that really the only tracing that is difficult, is at all, I would say mostly difficult, is the fair tracing. And that's for a very short period of time. Once you get into the Raymond James era, when the Baird account is transferred into Raymond James, it's by lock, and there's not much movement. And lock, I believe, is 1 and 2. You can follow it from 2004 all the way through to the date of judgment. Now, were those documents presented to the trial court, or were those attached to the motion to reconsider? So, the documents themselves, so the underlying statements, were part of the evidence at trial. And then after the judgment, and I'm assuming it was determined that maybe she didn't follow the tracing, then the motion to reconsider set forth additional detailed tracing. That's usually not the way to introduce evidence to a court, attaching it to a motion. It doesn't appear that the trial court did consider it, and I believe Mrs. Best feels that it is either waived, those are waived or forfeited, because they should have been presented at the trial court level. I know you didn't try the case, but that's still an issue that you need to answer. So, I would argue that throughout the trial, it was stated that all of these JP Morgan stocks were non-marital. There was testimony talking about how they were kept. There was testimony about where they started from the charter bank group on, talked about when they were deposited into the Baird account. The transition from the Baird account into the Raymond James. So, there was testimony regarding all of this, and the evidence was admitted. But the trial court did not believe and was clear that she did not believe your client on the issue of this $74,000. But that is back to what I would like to clarify, is that whether or not that $74,000 is marital is really inconsequential to the overall analysis. How can it be de minimis? Don't you have to first prove that it's non-marital in order to claim the de minimis argument? I think that if it's marital, its contribution was only to the security, the collateral. And at most, the collateral, what would be marital contribution to the collateral, was less than 2%. In the reply brief, I have a chart showing that what the ratio of alleged marital versus non-marital security is in the purchase of a total of 9,000 shares of bank one stock. And that's really what's at issue, because everything else can be traced to a solely non-marital source. And the trial court saw that chart that we're seeing. Well, the trial court has all of the documents in evidence. And if something is in evidence, the trial judge should be engaging in it when looking and making its decision. Well, she certainly engaged in something, because the judgment is rather complete. And it has more than I've seen in most judgments for dissolution of marriage. Rather than writing a memo and then a judgment, she just sort of combined, I think, the two. And she seems to have caught most of that. But yet, I just want to be sure that we're not seeing something that she didn't see. Or maybe even the form that she didn't see it in. Well, all of these, there's nothing that I am presenting that was not part of the record. Everything is contained in the record. There's nothing new. Except those lot charts, which really aren't contained in the record. They're attached to a motion. They weren't introduced. They're correct. However, the statements themselves demonstrate the lot. So if one were to look at the statements, you'd see the lot right there. Right. You haven't had a chance to talk about Wintrust. If you want to spend a minute or two with that, we can listen. Okay. Well, let me just, one of the inherited shares, I think, is a very good example of the tracing. And that includes the Wintrust staff as well. And I feel like this shows kind of an open and shut tracing for the court to understand. And if he can, if this comes clear, then maybe we can kind of go into the other tracings with it. This is from his mother's estate? This is his mother's estate. There is a 21st century account ending in 1127 that held only the inherited shares. No other funds were deposited. He then deposited the shares from the 21st century account on January 21st, 2009, into the Raymond James 7178. And that's a chart that I attached to the appendix at A114. It's the inherited shares chart. And the initial deposit had 2,000 shares of Bank of America, 2,000 shares of Wintrust, and 23,804 shares of J.P. Morgan. These shares were put into lots, readily distinguished lots, which was the standard method for Raymond James at that point. And these made the inherited shares identifiable and distinguishable in the account. And if you look at the chart, you can follow it over a period of 11 years. And during that 11-year period, 10,304 J.P. Morgan shares were sold. So as of the date, approximate to the date of judgment, September 30th, 2020, the Raymond James 7178 account held 13,500 shares of J.P. Morgan, 2,000 shares of Bank of America, and 2,000 shares of Wintrust, all of which were the very same shares that were deposited into the account in the 21st century inherited account. So they were worth $1,427,925 as of September 30th. And I believe that traces some of the theories mentioned in the evidence. I see my time is up, so if you'd like me to... Well, let me... Justice Jurgensen, do you have any other questions at this time? I do not, not at this time. And Justice Shostak? All right. All right. Ms. Keene, you will have your opportunities, as we've already discussed. Coming up, we'll let Mr. Page weigh in at this time, if he is ready to proceed. Mr. Page? I am, Justice. And may it please the Court, my name is Benton Page of Behrman LLP, appearing on behalf of the petitioner, affilee, and cross-appellant Heidi Best. And good morning to you, Justices. Good morning. And I appreciate the attention you all clearly have paid to the briefs in this very dense and complicated manner. This appeal centers around the trial court's classification of the party's assets, mainly Arthur's contention that the vast majority of the party's approximately $20 million estate derived from his premarital assets or inherited assets. Well, Mr. Page, do you agree, or are you focusing on that $74,000 deposit to essentially establish your case that it's all marital property? That is certainly a part of it, Justice Hutchinson. And to that point, there are a few issues with that deposit. As you noted, there is the interrogatory that had been posed to him, asking him to state the basis for any non-marital claims that he'd be asserting, which he didn't do. He left it rather vanilla, to say the least. And I was trial counsel. We were friendly at the last minute to put this together, as he produced a lot of documents before. But in any event, he did not identify that $74,000 deposit as a life insurance policy at the time of his interrogatory answers, nor did he identify it in his deposition. Let me ask, if this was truly a best hardware entity, would he have had to note it on that interrogatory? I believe so, to the degree he was going to assert at trial that that was part of the basis for his non-marital claims, which he ultimately did. I believe that that is responsive to that interrogatory, and he was required to do so. I'm sorry, Justice. Please go ahead. You're mute. What percentage was that of the overall estate, and is it de minimis? Not de minimis, I should add. Yeah, the relevance of that $74,000 deposit, and I don't mean to give a long-winded answer to a simple question, at the time he deposited it, it was the vast majority of that account. And the relevance became that once he deposited that, and there were a number of cash and securities deposits for which there was no tracing before that deposit, is that served as the basis and the collateral for the stock purchases from the Baird account and later the Raymond James accounts throughout the rest of the marriage. So once that was in, and it was verified by both Mr. Bess as well as his financial advisor, Mr. McGarren, that $74,000 deposit and the other shares that Mr. Bess had previously deposited into the Baird account served as collateral for the myriad stock purchases that took place thereafter. As collateral, did any money exchange from that account, or was it as what might be considered pure collateral, just security that whatever money is going to be paid is backed up by this particular amount of money? And does that make a difference that no money was exchanged? I don't know that it makes a difference, Justice. While the statement is, I think, a little bit backwards, it appears that Mr. Bess purchased about five stocks or five different types of stocks with that $74,000 deposit. The inner working of a margin line is such that you don't need it if you have cash in the account. But to the degree you have stocks you've acquired in the account and insufficient cash to purchase additional stock, you can use these stocks in the account as collateral for the additional purchases. So as I read the statements, Mr. Bess approximately simultaneously deposited that $74,000 and then used that $74,000 to purchase five different stocks that thereafter served as a collateral, the import of that being that when he thereafter purchased various stocks several months later in August of 1998, including some first Chicago National Bank stock as well as a number of others, that was the collateral that was used to purchase those stocks. And since it was under Section 503A6.5, which provides that if the solely non-marital property is used as collateral to acquire other assets, that the proceeds of the loan in question may be non-marital property. But that wasn't the case here since it wasn't the sole collateral. Alleged non-marital property was not the sole collateral by any measure. So all of the stock acquisitions from that point forward were marital property by definition. So counsel, Ms. Keene answered my question about de minimis, whether it had to be first considered marital, whether there had to be first a consideration of marital or non-marital of that property in order to get into a de minimis argument. She didn't seem to indicate that that was an issue, the classification. Your position is otherwise? It is, Justice. Looking at the case law, there really is no de minimis exception to the general rule under both 503C2, providing for when assets are acquired during the marriage using a combination of non-marital and marital property, as there is no exception under Section 503A6.5, where at least some marital property serves as a collateral for a loan. So to the degree Mr. Betz is asserting that there is some de minimis exception to the general rule that all... The rule is not the only thing that would control. There are some cases that discuss de minimis. And if I cite the wrong case, it's early on Monday morning, and there are a lot of cases here. Was the Wearies case one of them that talked about de minimis money? I believe so, and counsel cited another Fifth District case. If I can try to find it, I think I have it in my notes here somewhere. It'll come to me. How do you distinguish those then? I think it's the case you cited for the de minimis argument. And that particular case rested on the notion that there was marital property that was contributed to a non-marital account, which is quite a different thing than this situation, which A, it would have been non-marital property to the degree Mr. Betz's tracing through 1998 is believed contributed to a marital property account. But moreover, the assets that were later acquired with the margin line and the combination of marital and non-marital property, again, assuming the crediting of his tracing, would be under Section 503C2, marital property. So I think for those reasons, it is quite distinguishable. I think in Sitton's, the issue was that the marital contributions to non-marital property would create, at best, a reimbursement error, and the burden would shift to the spouse claiming the reimbursement to prove by clear and convincing evidence the right to reimbursement, whereas here we have the opposite situation. And, Mr. Page, I asked Ms. Keene the same thing. We know there is a fair amount of money involved in this particular case, and there were appraisers that testified, and there was the accountant who had handled, I believe, Mr. Betz's account for a significant period of time. But it seems to me, reading this case, that this is a little more complicated than some appraisers who are certainly well-qualified and an accountant who has been taking care of things but doesn't have records either. Why didn't your client, or why didn't you, since you were part of the trial situation, why didn't you hire an expert? I know I don't want an answer, it wasn't my responsibility. I didn't have the order of proof. I get that. But why weren't you trying to protect, or why didn't Ms. Betz try to protect, her theory with an expert? It's an excellent question, Justice, and the answer is we did. Larry Goldsmith was the forensic accountant who testified on behalf of Ms. Betz at trial, and he was a forensic accountant, but he addressed five or six of the particular assets that Mr. Betz asserted were his non-nervous property. That's true, but you're right, he was a forensic accountant, Your Honor, pardon my interruption, but it looks like Justice Jorgeson has, oh, there, I'm sorry, I apologize, I didn't see you on the screen. Something changed on my screen. My apologies for the interruption. No problem. She did change position on my screen, as did Justice Shostak. What are you two doing, musical chairs? He was, okay, he was this type of an accountant, a forensic accountant, but he didn't really, I believe the trial court did not give much shrift to his testimony either. She just, she said she didn't consider it. That is true, and I wish she could have given more explanation why she didn't. I mean, frankly, some of the explanations that she gave for classifying certain assets aligned with his arguments or his testimony, but she did indeed state that she did not consider his testimony much in rendering the decision. Well, if she didn't consider Mr. Goldsmith's testimony and she didn't believe some of Mr. Bess' testimony and your client really wasn't involved in a lot of these transactions, who did she rely on? I think she relied largely on the documents and the fact that the burden of proof was not met by Mr. Bess, who had it throughout this tracing. At least that's the way I read her judgment as well as her ruling on post-trial motions rendered three months later. And what is your position on these sheets attached to the motion to reconsider? Are they merely summaries of the other exhibits that the court had or what do you see them as? I see them as an attempt to re-argue and present arguments that were not made properly at the time of summation. The original law tracing argument was presented for the first time in Mr. Bess' motion to reconsider following the entry of judgment in which he attached a law chart. And we pointed out in our response to the motion to reconsider that there were some errors in that law chart, and quite a few of them, as well as a five-year gap in terms of the tracing between 2012 and 2017. And the motion to reconsider is not a time to raise wholly new arguments. The law argument, in our view, should have been raised in summation. Rather, and there's cases on this point, that Mr. Bess felt he lost in the judgment, inquiring whether that's true, but then he furiously put together wholly new evidentiary materials for the trial court to reconsider. But didn't the trial court have this information? It is now just in a different, I'm going to use Ms. Keene's word, receptacle than it was in the actual documents presented to the trial court? That's a great question, Justice, and some of it was, without a doubt, reflected in the kind of statements and what have you that were presented to the trial court at trial. Some of it was not. There were years in which, I think it was 2002 to 2006, in the Raymond James account statements, that they don't identify any lots of stock in the J.P. Morgan, I believe it was J.P. Morgan at that time, stock, as well as the Wynn Trust sometime thereafter. So there were, at the very least, a four-year gap that he presents as lots of stock in which there was no such thing reflected in the statements, as well as, again, the gap in statements between 2012 and 2017. So I would agree that some of it is reflected there. We did point to some errors in terms of what was presented in the lot charts in our response to Mr. Bess's motion to reconsider. But again, this was an argument, this lot idea in theory was not presented in any way, shape, or form in summation and was a new argument at that time. What was the trial court's actual response to these documents? Were they even considered? Well, did she even say she considered them? I can't say what she did in her head, but did she say she considered them? You know, I believe she said she considered them in her ruling on post-trial motions entered in October of 2021. However, she, as I recall, looking at it right now, stated that she felt between all the purchases and sales over the period of time that's depicted in that lot chart, some of the inaccuracies in it and the inability to identify exactly what related to Mr. Bess's premarital holdings and what did not, that she stuck to her soup pot analogy that she included in both the judgment and the ruling on post-trial motions. So I don't think she, I think she considered it, certainly. I just don't think she gave it a lot of weight or credit. As to the general issue here, you know, the contention by Mr. Bess is that the approximately $214,000 he held in premarital stock ballooned to some $8,184,000 that he's claiming that the trial court erred in classifying as marital property. The law on this point is fairly clear. Ultimately, any doubts as to the nature of the property are resulted in finding that the property is marital. In this case, the initial tracing, I think, is rather important. While a lot of the focus is on what happened once there were account statements that can be viewed and reconciled to some extent. Before that, Mr. Bess, and it's disputed, had Charter Bank stock. The Charter Bank stock that he held merged somewhere shortly after the marriage, and that, too, is not disputed. What is disputed is what happened thereafter. Mr. Bess testified that he received 26,778 shares of NBB stock in exchange for his Charter Bank stock. While there are some questions because he had more stock certificates in NBB than he did in Charter Bank, which is usually not the case where some merger stock is traded in, the real question comes thereafter. In the years that followed, Mr. Bess had that 26,000 in change shares of NBB. He sold 4,108 of those shares in 1992, leaving about 22,670 shares. However, according to his personal financial state, by 1994, he had 49,460 NBB shares. Arthur did not, at trial, supply any evidence as to how he acquired those additional 26,790 NBB shares. There was nothing about a stock split, as he asserts in his brief, as part of the record. That is through testimony through any other documents. And the only basis or citation that Mr. Bess provides for that alleged stock split is through a reference to his personal financial statement, which, again, does not reference a stock split. Since Mr. Bess acquired those additional 26,790 shares of NBB stock, it was his obligation to show, by clear and convincing evidence, that he acquired them by one of the means and exceptions of Section 503A of the Illinois Marriage and Dissolution of Marriage Act, which he didn't do. No evidence presented whatsoever on that point. As to the next particular exchange, Mr. Bess testified that he exchanged his NBB shares for shares of First Chicago National Bank some years later, shortly before he opened the third account. But, again, the only evidence of that was his personal financial statement. So there was no evidence presented as to the basis for which he traded the NBB shares for First Chicago National Bank shares or exactly what consideration he got, cash or similar. What would we be looking for when you say there's absolutely no evidence? What would we be looking for to establish evidence other than his financial statements? There are a myriad of ways you can do that. As he did with his charter shares, he produced a statement from the charter bank group indicating that, Mr. Bess, here is our plan of merger and how much you will get from each charter bank group stock exchange for your charter bank stocks at the various banks, which is, in my experience, pretty typical. He presumably traded in his stock certificates as he provided the charter bank group stock certificates and the NBB certificates to show that they were traded in and that they had been canceled and that he had new certificates. For the additional NBB shares, again, he didn't provide any evidence of a stock split at trial. He didn't provide any evidence of the shares he held in NBB being traded in for the First Chicago National Bank when that purportedly happened. The only evidence he provided regarding the latter was his own testimony and there was no evidence whatsoever regarding his acquisition of that additional 26,000 exchange NBB shares. The import of that is that when Mr. Bess deposited First Chicago National Bank shares into the Baird account in August of 1998, there was no way to determine whether the shares that were deposited emanated from the shares he received in exchange for the charter bank group or in exchange for the NBB or the shares that he received during the marriage, that 26,000 exchange. Nor is there any way to determine from that point forward what if any of those shares were the shares acquired during the marriage, shares that he testified he received in exchange for shares he held before the marriage, or some combination of the two. From that point forward, there was simply no way for the trial court to determine, at least not by the clear and convincing evidence standard, what portion of the Baird account was either in exchange for premarital shares or wasn't. Did your client have a theory of how those were acquired? No. I think when she testified, the trial was largely left in the dark other than some conversations with Mr. Bess regarding the Northview Financial Bank shares that he acquired. She had some involvement in hosting parties and the like, but that was about the extent of her involvement in their financial lives. She did resume working later in the marriage, but she was largely, and I'll tell you my client really had no idea they had the wealth they did until they got divorced, but she really knew very little about what had transpired over the years until we began receiving discovery. And I'm sure she did not anticipate that it would be as complicated and lengthy a process as it's been. I see my time is up, and I don't want to keep justice. We'll give you a little bit more time because I allowed Ms. Keene a little more time. Let's see. We've covered J.P. Morgan. Have you covered Wintrust as far as you want to cover it? I think so, Justices. I don't mean to make you refer to my brief anymore than you already have, but I think it's pretty well laid out, the nature of the various purchases of Wintrust stock over time, which were largely not documented and not provided the proof of where the funds came from. Some of it, again, came by his own testimony in exchange for his efforts as the director of the Northview Financial Bank. Jim. Go ahead. No, go ahead. I was going to correct my cross-appeal, so if you have a question about certainly defer. Justice Dorenson or Justice Shostak, any questions about where we are now? They're both shaking their head. All right. Go ahead. Okay, very good. The cross-appeal presented by Ms. Best is fairly straightforward and simple, and that's did Mr. Best need his burden of proof to show that he used exclusively non-marital property to acquire his interest in Best Capital Corporation and the real property located at 1875 Willow Road in Northfield, Illinois, which I'll refer to as the Willow property. The answer is no. The argument regarding Best Capital Corporation that the trial court adopted was that it was a, quote, continuation of Best Investments, which is agreed was a premarital partnership interest Mr. Best had, but he did acquire some of the interest in that partnership from his father in, I believe, 1995, perhaps 1996. But the Best Capital Corporation was incorporated in November of 1995 as a wholly new business entity. Arthur's testimony that he merely changed the name of Best Investments to Best Capital Corporation is refuted by that article of incorporation. There's no indication by any documents he provided that, as he said, Best Investments became Best Capital Corporation. On the 1995 partnership return for Best Investments, it reported assets of approximately $300,000. And when he amended the Best Investment Partnership Agreement about the same time as he formed Best Capital Corporation in November of 1995, there was no mention of Best Capital Corporation whatsoever. The two entities are both referred to similarly on its income tax returns in 1995, 1996 individual income tax returns that Mr. and Ms. Best filed, and they were two separate entities with their own distinct employer identification numbers. So the argument that there was a continuation of it, to the degree that's an exception of under Section 503A, it was simply not consistent with the evidence presented at trial. The only asset that Best Investments apparently owned was this Glenview Road property, Glenview, Illinois. However, that particular entity, the evidence shows, had been owned by a land trust since the beginning of time, and the land trust documents were not provided. We're not what? I'm sorry. We're not provided at trial. Do you dispute that that's a land trust? No. Indicated in the deeds for the property is for the Glenview Road property was an indication it was owned by a land trust. So I'm assuming it was. However, that was not part of the evidentiary record or produced at any point in discovery. So, you know, who exactly the beneficial owner of that land trust was, was somewhat mysterious. I'm assuming at some point Mr. Best transferred the ownership, the beneficial ownership of the Glenview Road property to the Best Capital Corporation, as indicated in the tax returns. But beyond that. Which would still make it non-marital, correct? The Glenview Road property was undisputed. Undisputed, right. That doesn't mean that the entity that owned it was, but there's no question that the property itself is not. As to the Willow Road property, the trial court did not really reason out its, its determination in at least the ruling on post-trial motions as to why it's determined it was non-marital. Didn't Willow Road come as a, as part of the inheritance from his mother's estate? No, that was the East Circle property that he received half of, as part of his mother's inheritance. But where did he share it with his sister? That was the one, correct. That he later bought out his sister's interest using a combination of the, the Raymond James 7178 accounts and a loan that he later paid off the Raymond James 7178 account. The Willow Road property is the property in Northfield that he acquired, I believe it was in 1997 or 1998, using a $900,000 mortgage for his price mortgage, $10,000 in earnest money and about $206,000 in cash. Mr. Best's testimony on the subject of where exactly that $206,000 came from was, to say the least, he at one point testified that it came from some combination of a certificate of deposit from Best Hardware, as well as a $46,000 loan or gift from his father. His testimony varied between his deposition and his trial testimony, and his trial testimony differed at various times on that point. What was not in dispute was that the $10,000 earnest money that Mr. Best paid for the property was from any non-marital source. He never asserted that, never provided any evidence of it. He never testified that it came from a non-marital source. As it did under Section 503.2, the property acquired in part with marital property and with non-marital property, irrespective of where that $206,000 came from, was marital property. As to the $206,000, however, there was simply no cogent evidence of where it came from. At trial, excuse me, in his deposition, Art testified he used the proceeds of the sale of MBD stock to fund the purchase of the Willow Road property. After being reminded that he had also testified he hadn't sold any MBD stock, Art changed his testimony and testified that he recalled $150,000 coming from a Best Hardware CD, $56,000 or $46,000 coming from a loan or gift from his father. He corrected his testimony and said he'd have to go back and try to find the actual papers, but he couldn't, which again, is far from clear and convincing evidence. Art did admit the certificate of deposit in question into evidence, but the certificate of deposit showed that it had a maturity date long after the purchase of the property. So it made little sense that he would have purchased the certificate of deposit with the maturity date after the closing to fund the purchase of this property. As to the source of funds to purchase the certificate of deposit, his testimony was that he thought it was purchased with the retained earnings of Best Hardware, which the trial court classified as marital property. So regardless of the $206,000 source, the $10,000 earnest money would render the property marital property. However, the testimony regarding the source of that $206,000 cash to close was hardly clear or convincing. It was on the contrary, all over the place, and not consistent with the other evidence to provide. One question, you had said earlier that this was more than a name change because on the other hand, both entities are listed and therefore they could never have been a single entity. Is that your position? They're, they're both. You're correct. Justice. I think if I'm reading your question correctly, that the mere fact that they both show up on a tax return does not mean that they couldn't be the same entity. Right. It's the name part of the year through the import of that. In this case is they both had different employer identification numbers. On their tax returns. And that's where distinct entities. And again, aside from Mr. Best is testimony that it was a continuation. You know, I don't even believe there's a mechanism to convert a partnership interest into a corporation, but to the degree there is these two were under the documents provided, not the same. And we're distinct entities. And I realized I've done well over my time and I thank you for your patience. And I will defer unless you just have any further questions. And I don't either. Thank you very much, Mr. Page. I think we're going to hear from you again, but I'm. We're getting there. Okay. Thank you very much. All right. We're going now to Ms. Keene. If you wish to respond, you may do so. Thank you very much. I want to start by talking about the collateral. Purchase. So, if you look at the stock JPMorgan stock in the bear account. There was. Mr. Page indicated that the entirety of the $74,000 was used. As securities to buy that stock. And that is just simply not true. The beard account. Mark. What is. So, I created a chart. Use of security with an M on the statement. And that means that it's part that particular security. Is part of the. Margin security. That's what the M stands for. So I created a chart. Citing the record citations. To the bear statement to show what particular security. We're used. To purchase all of the different. Stocks at different times. And we can go through the tracing of. The purchases of the JP Morgan stock. And show that. Very rarely was there any. That was used for that was purchased using that $74,000. When more JP Morgan stocks were purchased. So, where is that chart in the record council? I created the chart and it's a summation of the documents. That are in the record and their record citations. To each of those particular statements. So, for example. There, if you look to the tracing chart at a 1, 11 of the appendix. Immediately upon depositing the 70, the 17,472 shares. Chicago bank. Into the bear account are immediately made 2 additional purchases. The 1st national bank of Chicago on August 3rd, 1998. 1 for 59,000 shares. I'm sorry. 5,900 shares. And 1 for 2100 shares. So, a total of 8,000 shares. Those shares purchase some margin. Have 0 Merrill. And so between August 1st and August 31st, 1998, the margin was secured. Only by the 25,472 shares. Of 1st, Chicago, and 4,000 shares of. So, the newly purchased 8,000 shares joins the existing 17. To share for a new 100% non marital security total of 25 or 72. And then when on August 25th, 1998, when our purchase on margin, 4,000 additional shares of bank 1. Those shares were added to the margin security, which again were used purchase. With 100% non marital collateral. So, thereafter, there were sales and purchases of bank 1 stuff. Right? So art sold 6,000 shares on 51399. He purchased 3500 shares on 8 to 99. 3000 shares on 9, 399, 4000 shares on 9, 1699 and 2000 shares on 9, 2299. The 1st purchase of 3500 shares on 8 to 99. 200 shares of compact are included to with the bank 1. As security, but those shares of compact. Were purchased using the bank 1 shares of security. It was not part of the original. 74,000 dollar purchase. So, then it's only the 9,000 shares of bank 1 during September that were secured by bank 1 shares. And compact shares, which included 525 shares of compact that were purchased using the 74,860 dollars. Of license proceeds, so. Even if the proceeds were not deemed were deemed to be marital, not non marital. That contribution to the collateral itself would be presented. And as I said, at most, we're talking less than 2%. Contribution at most. We had a difference between we have about 2.5Million in all non marital. And somewhere in the realm of 50,000. That could potentially be marital and there's a chart. As I mentioned in my library. Setting that those ratios forward. Now, if if the court. Did not believe some of the testimony and she said she didn't some of the testimony of Mr. Best, isn't that going to impact this this trace that you just did on this chart? This tracing is purely based on the document. You do not have to find the 74,000 to be. Non marital to keep the. Stop from flipping to marital property and there was some discussion about. There's no minimum concept here and the minimum concept is all. Over in the light, it's very funny. I cited. To foster where the foster says that Smith was used to remedy the results by the Supreme Court. Where the court held a non marital apartment building value to 45,000 transmitted in the marital property because of the 3800 dollar contribution. Transmission transmutation can occur only where the contribution of marital assets to non marital property is significant. And I find it very hard to believe that that would not carry over into a situation where collateral is being used. The non marital or the marital property is not harmed in any way. By such a de minimis use of. Marital property as collateral, so it to me, it doesn't follow that. The, the contribution to a new app that has to be significant in order. But, yeah, collateral, it could be a tiny drop and then everything switched. It just would lead to absurd results. And then I want to also discuss. The, I hope I'm okay with time. I wanted to discuss the tracing. As it related to the original charter bank. There is some notion that somehow there was. No way to trace the charter from the original. What he originally owned in 1985. A year before the marriage, he owned 3913 shares and 5 small banks. Back in the public record, tie out the number of shares reflected on his financial statement year after year. Exactly to the total number ultimately deposited into the bear account. So, the, the 17472 of Chicago. 83998 and the 52112 dollars a bank 1 on 225. 2000. That's all traceable. So if you. After in December, 31st, 1996, there was a consolidation. Art was left with 26,778 shares of charter banks. And this was shown on his personal financial statement in 1990. 1987 that in 1988. And the bank or acquires charter bank group. And art received 23,296 shares of. And a 0.087 for 1 exchange rate, which is a matter of public record. This exact number of shares 23. 296 is listed on his 1998 financial statement. Long and short is that he then transferred all of them into the Raymond James account. Correct? All of it then ultimately through all of these iterations with stock splits. The mergers, everything ultimately was deposited into there. But there is a clear tracing of that stock from the original. Charter bank in. Where was in 1989? There was a 2, 3 for 2 stock split for the. Bank or stop and that resulted in our having 39, 944 shares of core. So, if you would multiply 1.5 by 23 to 96. You would get that amount of shares and that's a matter of public record that exchange rate. We know what his statement said his personal financial statement, but what was presented to establish. That it was that stock split or whatever created that amount. These were that were the trial court was asked to take judicial notice of. They are in the public record. They're readily verifiable. They're in general knowledge, well, establishing a court can take judicial notice. Of such facts in the public record at any point in proceeding. Well, that's true, but how's how's the court going to get there? You know, is court just going to go. What does the court look for? Well, there was testimony about. Some back splits and some mergers and some. Some mergers were very clear because. And the bank core became 1st, 1st, National Bank of Chicago 1st, National Bank of Chicago became bank 1. Charter bank group became NBD bank. So, there was an explanation for all of it and it can be traced mathematically. To the deposit into there. But did you ever ask the court to take judicial notice of something or did you present the evidence? As as part of this clear and convincing responsibility that you had. So, I, in the motion to reconsider, I know that it was specifically stated outright that these. Stock splits, et cetera could be taken. The court could take judicial notice of them. There was testimony about the court. All right, then let's have this question. Just the courts on. Maybe diligence and looking for this. Is that part of your clear and convincing evidence? Or do you, are you supposed to and again, I understand you weren't trial counsel, but isn't trial counsel responsible to present the evidence. Understood I believe the personal financial statements. Are very strong evidence of what. What's in existence at the time and following it through. I think that some of these mergers were well known in the community. It's. I would imagine just a little bit of investigation. Not much. You would be able to confirm that that actually occurred. But I believe that evidence was presented. And I see my time's up. Should I move to? Yes. Okay, probably move unless justice and justice anything on this issue. All right. Okay. So, let me. All right. 1 moment, I have to reorient myself here. So, Heidi's argument regarding best capital corporation and art best capital corporation. It relies on form over substance. These entities were mere continuation. Of the original nonmarital partnership. Which was best investment. Despite Heidi's efforts to make them into something more. Well, did they run not run, but do they show separately. On any of the documents that were presented, so they do, and they would be required to as a matter of law, because the 1995 tax returns. You would have to show. So, best capital was formed November 13th, 1995. Therefore, it would have to show the prior entity and the new entity both on the tax return. Because they were both in existence in that year. It was a sporting obligation. Now, the fact that there's a new tax ID, I believe that. A fact that really has no important. If you're changing from the partnership to a corporation. It may have been required and if it even if it wasn't required, and that's what he did. It doesn't make it not the same entity. It wasn't that your client's burden of proof to establish all of that. And not leave it to the to the trial court to try to figure it out. I'm looking at 2 different tax numbers and draw her a reasonable conclusion. Well, I think the court did draw that conclusion, but the court understood that it was all the same entity. And even the change from capital to our capital corporation, it was just. Different iterations of the same. Non marital entity, which was formed before the marriage. It was just all that was different and the court found this to be credible was. Just the form and essentially a name change. It was undisputed that that's. Investment was owned with art and father. Years before the party's marriage, our own 70%. His father owned 30% they purchased assets in a building when to do with. And that was the 2nd output post of best hardware, which was also a non marital business. That's hardware paid rent to best. Investments and investments paid the mortgage. And then in 1995, our father transferred his interest. Investments to art, although our sign promissory notes, those were ultimately forgiven. And then it was when he arch became the sole owner. Of that capital, he decided he wanted to change the name and the structure and he testified as such. So, in our client, it was the same entity to continue. And the court agreed and found it to be credible. What did this, what was the purpose of this particular account? Was it just to hold basically the best hardware and maybe some other. Other real estate that they owned. Yeah, ultimately sold or. Okay, and when did those take place? When did those sales take place? Well, there was a purchase. The willow road property that was discussed was 1 of the properties purchase. Through that capital. So, that and it was. The purpose was the non business. Was to purchase the long standing. Location of the original best hardware store. Which it had been leasing for years. And then best hardware again, was going to pay capital. Rent, which would then pay off the mortgage, which was the same thing that happened with the property. Now, the property was. Later transferred to purchase 1 of the parties properties. In Florida. That's capital. Was on title it purchased the property for 1,000,000, 150 dollars. It has a mortgage from the few bank and trust. The obligate was not art. It was the corporation there was evidence. Which the court accepted and found to be credible that a certificate of deposit from. That's hardware and a gift of art father paid the majority of the down payment. And that 10,000 dollars. Came from that capital for earnest money. So, sorry, I apologize. Well, no, this this, then this property that we're talking about. Basically was for purposes of best hardware or to. Maybe supplement best hardware's income, because there was a point in time when it wasn't doing as well. And the 1 store actually closed. Isn't that correct? Yeah, the 1 view store closed and that's why that property was sold. But the North field location where it had started. That they had been leasing before the opportunity came to purchase that land and then they purchased. Capital purchase that land, and the credibility of art about this purchase and the ownership of. That's capital is. You know, it's the trial court province to determine that credibility. Nothing has been presented that shows that marital funds were actually used. And if something were contributed. Heidi had the burden to under 503 C. To a, to trace the marriage of contribution, which she never did. Well, here the trial court does not express any disbelief or. Concerned about Mr. bestest testimony. Correct. It is in the other matters that I'm not even going to mention, because we're not going back there. There was some question. About credibility, so there was nothing here that we can point to where she says that that doesn't make any sense. That's right. All right. Justice Jorgensen, anything else? No, I have nothing else and justice. No, thank you. I guess this is the last time we hear from you. So do you have a summary. That you'd like to to make concerning this case. If a summary, is it all possible with all of these pages and exhibits. My, I would just say that it is very. The JP Morgan stock. Is able to be traced from the charter bank. That all the way through to Raymond James, it all went into the bear account. Everything that was in the bear account that affected the JP Morgan stock has been accounted for. The 90 and the 6600 shares. Those can be traced to the original charter bank dot and that's all done. Through the evidence at trial, the inherited shares. It's plain, they went into the Raymond James account. They remained a large portion of it remained. At the time of judgment, it is fully unfair. For a de minimis contribution of collateral. To convert millions of dollars. Of stock to merit of non marital stock to marital property. That is not what the statute was intended to do. Thank you. Thank you. All right. Mr. page. If you have anything, this is the time. Okay, justice now, try to keep it as short and sweet as possible. I'll note as to this notion of what service collateral for the margin line. Both Mr. best and Mr. and his stock broker testified that all of the stock held in the. Barrett account, and later the Raymond James account served as collateral for the margin associated with those accounts. That testimony is, of course, in opposite to the argument that this team presented. Which is that only some service. Yeah, and I'm not sure that the judge specifically said that Mr. McGarren. That she didn't believe Mr. McGarren, but she, she didn't. She didn't put a lot of stock in what Mr. McGarren said. Let's put it that way. Well, Mr. McGarren was the stack broker. I think it's Mr. Goldsmith that you're thinking of justice. Well, but Mr. McGarren couldn't tell us where the 74850 came from. Mr. McGarren didn't and he had been in charge or not in charge, but he had these were his accounts from there. He was Mr. Beth's father's. Person to, I believe he just he's been there for a long time, probably longer than I've been here, but. He just didn't know some things and. So, I'm not sure that she was paying much attention to that testimony. She was looking, as you said earlier, a document. I believe that's correct. You know, I don't think she necessarily found him not to be credible, but by the same token, he couldn't remember and there was no doubt of that. When asked about a lot of these transactions testimony, generally, I don't remember where it came from. He did testify pretty clearly on that particular point. Even if that point were true that the. Margin line only was secured by some of the shares held in the various accounts. Beginning in May 1998, there was a next to the compact shares and Mr. best spot with that 74,000 dollar deposit. So, you know, there was a use of those shares as part of the margin line from the get go as well. And those compact shares served as part of the collateral and Mr. best thereafter, but 4,000 shares of bank 1 stock and 8,000 shares of. 1st, Chicago national bank stock in August of 1990. And if I look at if I look again at those evidentiary charts, or. I don't know what to call them tracing charts. I guess. I, I should be able to find the M next to. Certain certain pieces within those charts that should explain this to me. Well, I'm frankly now looking at them justice and I don't know the answer to that question without looking at. I don't recall, but I don't remember seeing an M, but again, that's a question for Miss keen. As to the rest and in remarriage of Dan, this court rejected the theory of the burden of the marital state and relative consideration. The types of loans that are at issue there. The husband had posited that. He did not burden the marital state when you use marital properties collateral purchase. What he asserted was. Non property, and this court rejected that theory. Thereafter, the legislature codified. The principal and Dan in session 503, a 6.5. You know, again, there is no argument to be made that. If any marital properties uses collateral, but the resulting property. Is not in there in opposite to section 503, a 6.5. So, the stock splits, I would point out this is the bank stocks splits that are at issue. The evidence at trial, there was no evidence of. Mr. best for the 1st time, either in summation is motion to reconsider attached. Reported printouts of some online newspaper claiming that there have been these. They were not part of the evidentiary record. Mr. best never asked the. Trial court to take judicial notice of those reported facts. I would note that it was a private corporation, not a publicly traded corporation. So, I certainly don't think that the nature of those stocks splits would be beyond dispute. And was that Northfield financial. No, that was the bank that Mr. best is now asserting. Was in part the result of stocks, let's see, we gain in stock. However, again, since it was raised after proofs at close. Never had an opportunity to investigate or look into that issue and Mr. best never made an effort to ask the court to take initial notice. Of those facts, so we did address it in our response to the motion to reconsider. This case, just. This is a procedural case or question now from time of filing until time of trial was a little over 2 years. Wasn't it 2018, June of 2018 to October of 2020. Very good. Yes, that's quite right. So you've got some, you've got 2 years doing what discovery. I mean, I know it's zoom time and there are other issues going on, but even with the cobit restrictions, you could still do written discovery. You could still do depositions by by zoom or however. So it's, I mean, there was a lot of discovery going on. Correct. There certainly was, we had the trial push back a few times and it's in the records. It's no secret because of non compliance with discovery issues. And Mr best produced a lot of the documents that ultimately went into. The evidence at trial shortly before trial began. So, yes, though, you know, we received a lot of documents. Shortly before trial, that was not among and that was never produced or raised at any point. Before the trial court until again, forgiving, forgiving me, but I, it was either the summation closing argument. For the motion to reconsider that that was raised for the 1st time. There was no motion to reopen proofs planning that there had been. Additional evidence that should have been admitted or that Mr. best had found something. Had had missed previously. And with that, just as I see my time is up, so there are no further questions, I will. Just shaking. No, no. And again, I don't have any. Now, and I'm not going to ask any more later, but if you have some summation, you may make it now. I simply note and tie back to what I began with, which is that. This whole appeal, or I should say, at least the, the. Appeal by Mr. best centers on this notion that he. Should have could have received approximately 8M dollars in assets in exchange for that 200,000 dollars in stock. There are, say, the least. A lot of holes and leaps and bounds that 1 has to make. To reconcile his argument and his claim. With what he had before he had the burden at all time to prove that all these exchanges and all the acquisitions. Were solely in exchange for non property and as the trap were found. With the exceptions, of course, which he did find at the property. He did not do so. All right. All right, thank you counsel for your arguments and we've, we've extended time, but a lot of hearings and a lot of pages of exhibits and record. I think justify that at this time. I would say, if anybody's going beyond, which you're, of course, entitled to when their light goes on, you're done. So hopefully that will be something that you can either pare down or won't be an issue. But we do thank you this morning for your argument and for entertaining our questions. We will make a decision in this matter in due course. And at this point, we will stand adjourned and you are excused. And any persons who were with you are excused from the proceedings. Thank you. Thank you very much. Thank you. Thank you. Have a good day.